IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEAN LEROY DEYOUNG,                          CV 08-6131-MA

       Plaintiff,                          OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

KATHRYN TASSINARI
Drew L. Johnson, PC
1700 Valley River Drive
Eugene, OR 97401
(541) 434-6466

       Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158


1 - OPINION AND ORDER

THOMAS M. ELSBERRY
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2112

       Attorneys for Defendant

MARSH, Judge.

     Plaintiff Dean Leroy DeYoung seeks judicial review of the Commissioner's final decision denying his January 12, 2004, application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.

     Plaintiff claims he has been disabled since August 1, 1996, because of dysthymia, gender identity disorder, personality disorder, social phobia, tendinitis in the left shoulder, and carpal tunnel disorder.  His claim was denied initially and on reconsideration.  On March 22, 2006, the Administrative Law Judge (ALJ) held an evidentiary hearing and on September 29, 2007, issued a Notice of Decision that plaintiff is not disabled.  On February 28, the Appeals Council denied plaintiff's request for further review.  The ALJ's decision, therefore, was the Commissioner's final decision for purposes of judicial review.

     Plaintiff now seeks an Order from this court reversing the Commissioner's final decision and remanding the case for the payment of benefits.  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action with prejudice.

2 - OPINION AND ORDER

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since December 2003.

At Step Two, the ALJ found plaintiff suffers from severe impairments of dysthymia, gender identity disorder, personality disorder with passive-aggressive, borderline, dependent, and histrionic features, social phobia, a history of psychological factors affecting his physical condition, and histories of knee and shoulder pain, tendinitis in his left arm, carpal tunnel syndrome, and severe marijuana abuse.  20 C.F.R. §416.920©) (an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found plaintiff's impairments do not meet or equal any listed impairment.  Plaintiff is able to lift up to 50 lbs occasionally and 25 lbs frequently, has difficulty maintaining a firm and forceful grip on tools, and is unable to perform fine motor dexterity tasks.  He can remember

3 - OPINION AND ORDER

and carry out simple, routine instructions, but not detailed and complex instructions.  He should avoid intensive interpersonal interaction, including working with the public.

At Step Four, the ALJ found plaintiff is unable to perform his limited past relevant work which is characterized as similar to a boat shop helper.

At Step Five, the ALJ found plaintiff is able to perform jobs that exist in significant numbers in the national economy, including sweeper/cleaner and hand packager.

Consistent with the above findings, the ALJ found plaintiff is not disabled and denied his claims for SSI benefits.

## **LEGAL STANDARDS**

The initial burden of proof rests on the claimant to establish disability.  <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert</u>. <u>denied</u>, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere

scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however, is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

5 - OPINION AND ORDER

## ISSUES ON REVIEW

The issues are whether the ALJ erred in (1) rejecting plaintiff's testimony, (2) rejecting lay witness testimony of plaintiff's step-daughter, (3) rejecting the medical opinion of a treating physician, (4) failing to adequately consider the opinion of a clinical social worker, and (5) failing to show plaintiff could perform other work in the national economy.

## PLAINTIFF'S TESTIMONY

This evidence is drawn from plaintiff's testimony at the hearing and a work history report he completed in support of his disability application.  At the time of the hearing, plaintiff was 55 years old.

**Work History**.

Plaintiff has a high school diploma, with little other continuing education.  From 1980-1983, he worked as a fee taker at a dump site.  From 1985-1987, he worked part-time doing landscaping.  From 1987-1992, he worked part-time doing cleanup for a boat-builder.  Plaintiff last performed work of any kind doing odd jobs for neighbors in 1998-1999.  He quit his regular job in 1992 because his hands had deteriorated to the point that he could no longer hold tools.

Plaintiff lives in a recreational vehicle he owns that is located on a friend's property.  He pays "rent" for the use of the property by cleaning up trash on it.

6 - OPINION AND ORDER

**Daily Activities.**

Plaintiff listens to the radio.  At night, he watches television.  He uses a computer given to him through a recycling project and plays solitaire on it for a few minutes until his hands hurt.  He does not cook.  He drives once or twice a week on short trips to the store.  He tries to write occasionally.  He does the dishes once a week.  He shaves occasionally, but has difficulty doing so.  As part of his "rent" payment, he spends time with his elderly landlady to keep her company.

Plaintiff has not looked for work because the only thing he knows how to do is work with hand tools.  Likewise, most of his hobbies involved using tools.

Plaintiff sometimes drinks lightly late in the evening to help him sleep.  He used marijuana until the fall of 2003.

**Medical Issues.**

Plaintiff's physical impairments include limited nerve function in both hands, Chronic Obstructive Pulmonary Disease (COPD) caused by paint and welding fumes inhaled in his past work, and chronic shoulder and knee pain.  He has had bilateral carpal tunnel surgery, which improved his hands somewhat, but picking up the trash on his friend's property has made his hands worse again.  They will begin to go numb after 20-30 minutes of such activity.  He is uncertain whether additional surgery recommended by his doctor would be helpful.

**Psychological Issues**.

Plaintiff has gender identity issues and is depressed. Although he has a masculine appearance, he feels like a woman. He is uncomfortable in crowds and around people in general and has difficulty sleeping.  He is easily distracted and has anger management problems, even over trivial matters.

**LAY WITNESS TESTIMONY**

Plaintiff's step-daughter, who also describes herself as Plaintiff's friend, completed a questionnaire regarding her step-father's activities.  She has known him for 28 years.  She spends one-two hours a day with him watching television, eating, and talking.  Plaintiff has trouble sleeping because of numbness and aching.  He has to be reminded to bathe and do the laundry, and he shaves only occasionally.  His meals usually consist of frozen dinners and snacks.  He takes out the trash, picks up litter, and sometimes waters the lawn in the summer.  Once a day he drives to her house and goes shopping twice a month.  Plaintiff's hobbies include reading and watching television.  He used to be more outgoing, but he does not get along well with people and has to be "dragged" to social events.

Plaintiff's physical and mental condition have affected almost all of his movements, including his ability to climb stairs, use his hands, and complete other tasks.

**MEDICAL/MENTAL HEALTH TREATMENT**

**Deschutes County Mental Health Services.**

In October 2000, plaintiff sought treatment for anxiety and depression through a licensed professional counselor.  He stated he was unemployed and reclusive because of a long history of anxiety and depression relating in part to trans-gender issues that have included cross-dressing since childhood.  He smoked cigarettes and marijuana to relieve his anxiety.  He had suicide ideation but no plans to kill himself.  During the intake interview, he was self-critical and initially avoided eye contact until his anxiety lessened.  He had a depressed, anxious mood.  His insight and judgment, however, appeared to be fair.  The counselor diagnosed Dysthymic Disorder, Generalized Anxiety Disorder, and Gender Identity Disorder, and he assigned a GAF score of 45 (serious symptoms and/or impairment in social, occupational, and school functioning).

Plaintiff was given a therapy treatment plan with a goal towards reducing his symptoms of anxiety and depression and building a support system and confidence.  From November 2000 through July 2002, plaintiff attended individual therapy sessions during which he variously discussed his social isolation, depression, and anxiety relating to trans-gender issues and his suicidal ideation.  Improvement in his mental state was noted on

several occasions.  He was discharged from care in September 2002, when he moved to the Eugene/Springfield area.  The discharge notes reflect his suicidal thoughts were resolved, he had stopped taking medications, and he "appeared to benefit from regular therapy."  Plaintiff was instructed to contact Community Mental Health  Services in Eugene/Springfield to continue his emotional support.

**St. Charles Medical Center**.

In January 2001, plaintiff underwent a right carpal tunnel release.  A month later, the same procedure was repeated in his left wrist.  In April 2001, plaintiff had a pulmonary function test that revealed a borderline mild airway obstruction.

**Bend Memorial Clinic**.

In December 2001, plaintiff was treated for depression and bilateral knee pain.  He stated that he suffered a severe injury to his knees as a teenager.  As a result, the left knee "gives out" and "locks," requiring him to "pop" it out.  It also swells every couple of weeks.  He also complained of right shoulder pain.

On examination, plaintiff's right knee had no swelling or effusion and he had a full range of motion, with medial joint line tenderness and some popping sounds on flexion and extension. His left knee lacked full flexion but had good extension.  He had tenderness in the lateral joint line and stress along the medial

and lateral joint lines.  There was no indication of ligamentous laxity, effusion, or swelling.  There were popping sounds with flexion and extension.  X-rays were normal.

Plaintiff was referred for further evaluation of his left knee and right shoulder.

**David Knowlton, M.D. - Family Practitioner.**

Plaintiff first saw Dr. Knowlton in August 2002, complaining of right shoulder pain when he lifted or threw anything.  He also  described "complicated, longstanding mental health issues." Dr. Knowlton diagnosed depression for which he prescribed Wellbutrin, shoulder pain for which he recommended Naprosyn and shoulder exercises, and mild COPD for which no treatment was necessary.

In September 2002, plaintiff reported his depression was much better because of the Wellbutrin.  In December 2002, plaintiff  again reported he was doing very well.  He continued to smoke cigarettes, and occasionally, marijuana.  Dr. Knowlton assessed Depression with some trans-gender issues.  Plaintiff's medical records reflected his COPD was much better than plaintiff had indicated.

From December 2002 through November 2005, plaintiff treated with Dr. Knowlton frequently.  Dr. Knowlton routinely stated that plaintiff's depression was stable and plaintiff was "quite happy" with using estrogen to address his trans-gender issues.

Plaintiff advised Dr. Knowlton that he had stopped using marijuana in October 2003.

In May 2005, plaintiff complained of left shoulder pain. Dr. Knowlton assessed left rotator cuff tendinitis and he recommended range of motion exercises.  Two months later, plaintiff still had shoulder pain.  An x-ray in September 2005, showed an "unremarkable bony architecture of the left and right shoulders."  The diagnosis was a probable bilateral impingement, but no rotator cuff tears.  In November 2005, an ultrasound revealed left biceps tendinitis.  Dr. Knowlton injected the area with a steroid.

In June 2006, Dr. Knowlton wrote a three-line letter that plaintiff "suffers with chronic shoulder pain, COPD, social phobia and carpal tunnel syndrome.  In my opinion he cannot engage in full-time employment."

**Relief Nursery - A. Nicole Ivey, LCSW.**

In August 2004, plaintiff began treatment with licensed Therapist Nicole Ivey.  He requested that his initial interview be at a public coffee house.  He was dressed as a female.  He was anxious at first but relaxed as the interview progressed. He described his family history, that included a marriage that ended in divorce.  The couple had an adult son and step-daughter. He reported family difficulties and increased tension arising from his trans-gender issues.

12 - OPINION AND ORDER

Plaintiff gets depressed and experiences anxiety and panic attacks associated with going out in public, particularly if he is dressed partially in female attire.   As a result, he feels socially isolated.

Ivey noted plaintiff was oriented and exhibited good judgment and insight.  He was cooperative and interactive.  His thought pattern was logical and coherent.  Based on this interview, Ivey diagnosed Post Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder, and Gender Identity Disorder.   She assigned a GAF of 45 (serious symptoms and/or impairment in social, occupational, and school functioning), the same score plaintiff was assigned four years earlier by Deschutes County Mental Health.

Ivey also diagnosed Chronic Joint Pain, Emphysema, and Bilateral Carpal Tunnel Surgery.

Ivey set treatment goals for plaintiff to better manage his mental health issues, address his gender identity issues, and deal with his feelings of social isolation.

In September 2005 and March 2006, Ivey noted plaintiff continued to experience social anxiety that was not accounted for by use of substances, by a panic disorder, or by any other mental disorder.  He exhibited "classic symptoms of a Dysthymic Disorder, early onset, with superimposed Major Depressive Disorder, recurrent."  Ivey noted "[h]is profile suggests marked

13 – OPINION AND ORDER

distress and, unless there is an exaggeration of symptoms, significant impairment in functioning" including difficulties with self-care, hygiene, sleeping, and social/family relationships.  He appeared at times to be anxious, withdrawn depressed, and overwhelmed.  His speech was flat, with no affect. Nevertheless, he expressed himself coherently and logically, with no evidence of psychotic ideation.  He described increasing difficulties with routine daily activities that involved more physical chores such as chopping wood, working with tools, or lifting heavier items.  He was independent, however, in that he was able to do his laundry and perform routine household chores.

Ivey opined plaintiff's prognosis was guarded.  She noted, however, his social anxiety was "slightly improved in specific situations," his "depressive symptoms are less intense and of shorter duration" and "he has improved his self-esteem."

Ivey recommended individual therapy to help plaintiff manage his symptoms of social anxiety and depression, and encouragement in improving his eating and sleeping habits and getting exercise.

Ivey diagnosed psychological impairments including social phobia, generalized, dysthymic disorder, major depressive disorder, recurrent, severe without psychotic features, gender identity disorder, and personality disorder NOS with dependent and schizotypal features.

Ivey also diagnosed physical impairments including chronic pain in plaintiff's hands, forearms, shoulders, and neck region with reported genetic bone deformation in his shoulder; carpal tunnel pain, and knee pain, by client report.

Ivey assigned a lower GAF score of 43 from the year before notwithstanding the various improvements noted in plaintiff's mental status.

In testimony at the hearing before the ALJ, Ivey focused on plaintiff's depression and social anxiety, noting that these were life-long issues for plaintiff that appear to predate his trans-gender issues. She opined he would not be able to "maintain very well in a work situation." His "severe depression" impacts his daily self-care activities. In addition, she noticed that, during her sessions with him, he often shifted his position because of pain and mentioned new injuries or an area of his body that hurt because he overdid it. She also testified "he still hasn't adjusted to some of the physical limitations that he is beginning to experience as he gets older."

## MENTAL HEALTH EVALUATIONS

### William Trueblood, Ph.D., ABPN.

In April 2002, Dr. Trueblood, a neuropsychologist, examined and tested plaintiff for purposes of evaluating his mental health. He found plaintiff was a reliable historian and cooperated in attempting to provide accurate information. The

15 - OPINION AND ORDER

information plaintiff provided was consistent with a similar evaluation Dr. Trueblood performed a year earlier.  Plaintiff made a "very good effort" on testing.

Plaintiff's IQ test score was 120, placing him in the superior (90%) range of intellectual functioning.  The evidence as to whether plaintiff had a cognitive impairment was equivocal, but plaintiff's score in general suggests any such impairment is mild.  Plaintiff's Personality Assessment Inventory score was valid and plaintiff answered the questions in a forthright manner.  The results reflect a marked level of distress and a severe impairment of functioning.  Dr. Trueblood opined that plaintiff's use of marijuana was not a significant factor in his overall functioning level.

Based on his examination, Dr. Trueblood diagnosed Major Depression, moderate, Social Phobia, generalized, Transvestic Fetishism with Gender Dysphoria, Psychological Factors, affecting plaintiff's physical condition, Cannabis Abuse, and Personality Disorder NOS, with passive-aggressive and borderline features. Dr. Trueblood also diagnosed physical impairments of Emphysema, Carpal Tunnel Syndrome and Status post-Bilateral Surgery, shoulder and knee problems, history of mild traumatic brain injury, and infrequent episodes of brief seizures based on plaintiff's self-report.

Dr. Trueblood assigned a GAF of 48 (serious symptoms and/or impairment in social, occupational, and school functioning), which is in the same range but slightly higher than the scores found by Deschutes County Mental Health and Ivey.

**David R. Truhn, Ph.D.**

In February 2004, Dr Truhn, a psychologist, conducted an examination and testing similar to that done by Dr. Trueblood. Plaintiff's IQ test score range was between 109 and 117, in the high end of the average range.  Plaintiff demonstrated good persistence and worked at an adequate pace during the test.

On neuropsychological testing, plaintiff placed in the below average range, and exhibited a significant amount of psychological stress.  Dr. Truhn opined the test score "does not seem to indicate any neuropsychological problems at this time."

On the MMPI-II, plaintiff had a valid score that indicated a "significant amount of psychological stress" and "significant depression."

In summary, Dr. Truhn diagnosed the Dysthymic Disorder, early onset, Gender Identity Disorder, Personality Disorder NOS, and physical impairments including a missing tip of the right index finger, carpal tunnel pain, back and knee pain, and a history of a head injury.  Dr. Truhn assign a GAF of 39 (major impairment in several areas, such as work or school, family relations, judgment, thinking , or mood).

Dr. Truhn offered a "guarded" prognosis that plaintiff "seems to primarily think that the physical problems are a primary inhibitor in his ability to seek and maintain employment" and that his gender identity issues exacerbate his "depression and anxiety." He concluded plaintiff has moderate anxiety when wearing women's clothing in public, mild limitations in activities of daily living, mild limitations in concentration, persistence, and pace, and no decompensation episodes (temporary increases in symptoms causing a loss of ability to function."

### MEDICAL/MENTAL HEALTH CONSULTATIONS

The following records reflects the opinions of medical practitioners who consulted with the Commissioner based on a review of plaintiff's medical/mental health treatment and evaluation records.

**Scott Pritchard, D.O.- Osteopathic Medicine.**
**Mary Ann Westfall, M.D. - Physical Medicine.**

These physicians reviewed plaintiff's medical treatment records. Dr. Pritchard noted plaintiff's physical exam findings were minimal. He opined and Dr. Westfall concurred that plaintiff is able to lift 50 lbs occasionally and 25 lbs frequently, stand, walk, and sit for six hours in an 8-hour workday, unlimited pushing and pulling, and limited fine manipulation.

**Bill Hennings, Ph.D. - Psychologist.**
**Paul Rethinger, Ph.D. - Psychologist.**

Dr. Hennings reviewed plaintiff's mental health treatment records.  He agreed with plaintiff's treating mental health practitioners that plaintiff suffers from Dysthymic Disorder and Personality Disorder.  He opined and Dr. Rethinger concurred that plaintiff is markedly limited in his ability to interact appropriately with the general public, but "is capable of completing a normal work week with normal supervision and adapting to changes in the workplace."

## ANALYSIS

**Rejection of Plaintiff's Testimony.**

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'"  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not produce objective medical evidence of the symptoms or their severity.  Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant produces objective evidence that underlying impairments could cause the pain complained of and there is no affirmative evidence to suggest the claimant is malingering,

19 - OPINION AND ORDER

the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). See also Smolen, 80 F.3d at 1283.  To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. Id. at 1284 (citations omitted).

Here there is no evidence of malingering.  The ALJ noted plaintiff's "self-perception" of the type of work he is able to do is "clearly below the medium exertion level."  Nevertheless, the ALJ also noted plaintiff's daily activities, the level of treatment he has received for his physical impairments, and the amount and type of medications he is prescribed belie his claimed level of physical impairment.

I have reviewed the record as a whole and conclude the ALJ's analysis of plaintiff's credibility adequately reflects the paucity of medical evidence supporting plaintiff's claimed level of physical impairment.  For example, over a three-year period, Dr. Knowlton treated plaintiff for his physical impairments,

which included shoulder pain, COPD, and bilateral carpal tunnel syndrome.  Diagnostic tests were unremarkable as to the bony structure in both shoulders.  Dr. Knowlton assessed "probable bilateral impingement" of his shoulders with no evidence of rotator cuff tears.  He treated plaintiff with ibuprofen and a steroid injection.  He also recommended strengthening exercises.

There is no record that plaintiff complained of or received treatment for significant knee pain by Dr. Knowlton.  The record of treatment plaintiff received for symptoms relating to carpal tunnel syndrome are also sparse.  In addition, Dr. Knowlton stated plaintiff's COPD as "mild" and required no treatment.

Similarly, the treatment records submitted by social worker Nicole Ivey reflect diagnoses of emphysema, chronic joint pain and bilateral carpal tunnel syndrome.  Indeed, plaintiff apparently complained to her of "chronic carpal tunnel pain in hands and forearms; chronic pain in elbows, shoulders, and neck region."  There is no medical evidence, however, that plaintiff suffers from emphysema, and no significant reference to pain in the elbows and neck.  Finally, although plaintiff was treated for knee pain, he did not rely on that condition as a basis for his disability claim, and as noted, the medical record is sparse as to the severity of his other impairments.

If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.

21 - OPINION AND ORDER

Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).  I find
there is no basis in the record to second-guess the ALJ's reasons
for not crediting plaintiff's testimony regarding the severity of
his physical impairments.

**b.    Rejection of Lay Witness Evidence**.

Lay witness evidence as to a claimant's symptoms "is
competent evidence that an ALJ must take into account" unless he
"expressly determines to disregard such testimony and gives
reasons germane to each witness for doing so." Lewis v. Apfel,
236 F.3d 503, 511 (9th Cir. 2001).

The ALJ did not address the lay witness testimony of
plaintiff's stepdaughter.  As set forth above, she testified
plaintiff had difficulty moving, using his hands, and climbing
stairs.  She described plaintiff's daily activities, which, in
addition to watching television, include taking out the trash,
picking up litter as part of his rent payment, and driving on a
daily basis to her home.  She also addressed plaintiff's symptoms
of social phobia, *i.e.*, he has to be "dragged" to social events.

I conclude the ALJ erred in not addressing this evidence.
The error, however, was harmless because no reasonable ALJ,
even when fully crediting it, would have reached a different
disability determination based on it.  See Stout v. Commissioner,
454 F.3d 1050, 1055 (9th Cir.2006)(failure to discuss lay witness
testimony was inconsequential and, therefore, harmless error).

c.  **Rejection of Medical Opinion**.

The opinions of treating physicians should be credited as true if the ALJ fails to provide clear and convincing reasons for rejecting them.  See Smolen v. Chater, 80 F.3d 1273, 1992 (9th Cir. 1996).

Plaintiff contends the ALJ improperly rejected the disability opinion of Dr. Knowlton, who treated plaintiff over a three year period.  He opined plaintiff is unable to work because of "chronic shoulder pain, COPD, social phobia and carpal tunnel syndrome."  The ALJ found the opinion to be "redundant and gratuitous" because "no basis for the opinion is stated" and "[t]he scope and nature of the problems identified in Dr. Knowlton's treatment notes are accounted for in the assessment of residual function capacity."

On this record, notwithstanding the brevity of his stated reasons for rejecting Dr. Knowlton's disability opinion, the ALJ accurately conveyed that Dr. Knowlton's medical records do not support such an opinion and plaintiff's degree of impairment was described "with greater precision" elsewhere in Dr. Knowlton's chart notes.  I agree.

Dr. Knowlton routinely noted plaintiff's depression was well-controlled by medication and plaintiff was happy with estrogen treatments that were prescribed for his trans-gender

23 - OPINION AND ORDER

issues and accompanying depression, which are the bases for plaintiff's social phobia claim.  Dr. Knowlton also noted plaintiff's COPD was mild and required no treatment, yet he included that condition as a basis for his disability opinion.

   Plaintiff's social phobia and his difficulty in using tools and performing fine motor dexterity tasks because of carpal tunnel syndrome were also accounted for by the ALJ in his finding as to plaintiff's residual function capacity.  The ALJ also addressed plaintiff's shoulder pain, noting an examination by Dr. Knowlton reflected plaintiff's shoulders were generally normal, and his shoulder and arm strength were "relatively good."

        On this record, I conclude the ALJ gave clear and convincing reasons for rejecting Dr. Knowlton's disability opinion.

**d.    <u>Inadequate Consideration of Non-Medical Source Opinion</u>.**

        As set forth above, Social Worker Ivey's final diagnosis of plaintiff in March 2006 included "Social Phobia, Dysthymic Disorder, Major Depressive Disorder and Gender Identity Disorder, Chronic Pain in the hands, forearms, shoulders and neck region with a "reported genetic bone deformation in his shoulder," as well as carpal tunnel pain and knee pain "by client report."

        The opinion of a non-medical "other source" may be considered on issues such as the severity of the impairment and

24 - OPINION AND ORDER

are relevant as a "lay witness's observations as to how a
claimant's "impairment affects [his] ability to work." Dodrill
v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

The ALJ considered Ivey's "guarded prognosis" regarding the
effect of plaintiff's social phobia on his ability to work.  He
considered her opinion that plaintiff did not appear to be
capable of returning to work in a small workshop.  He noted,
however, that Ivey relied in large part on plaintiff's subjective
views.  Finally, he noted Ivey's assessment of plaintiff's
capabilities were contradicted by the opinions of the consulting
physicians.

On this record, I conclude the ALJ adequately explained and
gave "germane" reasons for not accepting Ivey's opinion regarding
plaintiff's ability to engage in substantial gainful activity

**e.   Inadequate Assessment of Residual Functional Capacity.**

Plaintiff contends the vocational expert was given an
inadequate hypothetical based on the ALJ's erroneous assessment
of plaintiff's Residual Functional Capacity (RFC).

For all the reasons stated above, I conclude the ALJ
adequately considered the medical and non-medical evidence and
his findings regarding plaintiff's physical and psychological
limitations supported his assessment of plaintiff's RFC.

## CONCLUSION

For all the reasons set forth above, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 18 day of May, 2009.


<u>    /s/  Malcolm F. Marsh    </u>
MALCOLM F. MARSH
United States District Judge

26 - OPINION AND ORDER